UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **JACLYN BJORKLUND** | **CASE NO. 2:23-CV-01020** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **NOVO NORDISK A/S ET AL** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court is a Motion to Dismiss [doc. 49] filed under Federal Rule of Civil Procedure 12(b)(6) by defendant Eli Lilly and Company ("Lilly"). Plaintiff opposes the motion. Doc. 60.

## I.
## BACKGROUND

This products liability suit arises from plaintiff's use of Ozempic (semaglutide) and Mounjaro (tirzepatide), two injectable prescription medications that have been approved by the FDA for control of blood sugar in adults with Type 2 diabetes. Both medications belong to a class of drugs called GLP-1 (glucagon-like peptide-1) receptor antagonists. Doc. 5, ¶¶ 3–6. Plaintiff, an adult resident of Louisiana, took Ozempic for more than one year, concluding in July 2023, and Mounjaro thereafter on prescription from her physician(s). *Id.* at ¶¶ 9–12. She alleges that her use of both drugs resulted in gastroparesis, "a disorder that slows or stops the movement of food from the stomach to the small intestine," which caused her to suffer

> severe vomiting, stomach pain, gastrointestinal burning, being hospitalized for stomach issues on several occasions including visits to the emergency room, teeth falling out due to extreme and violent vomiting, requiring additional medications to alleviate her extreme and violent vomiting, and throwing up whole food hours or even days after eating.

*Id.* at ¶¶ 14, 80. She further alleged that defendants "acknowledge that gastrointestinal events are a well known side effect of the GLP-1 class" but have "downplayed the severity of the gastrointestinal events" and "never . . . warn[ed] of the risk of gastroparesis[.]" *Id.* at ¶ 7.

Plaintiff filed suit in this court on August 2, 2023, against various Novo Nordisk entities (manufacturers of Ozempic) and Lilly (manufacturer of Mounjaro). Doc. 1. She raises claims of failure to warn and breach of express warranty under the Louisiana Products Liability Act ("LPLA"), La. R.S. 9:2800.52 *et seq.* Doc. 5. She requests compensatory and punitive damages as well as attorney fees. Lilly now moves to dismiss the claims against it, arguing that (1) the failure to warn claim is preempted by federal law, (2) the failure to warn claim is also barred by the learned intermediary doctrine, (3) the breach of express warranty claim is insufficiently pled, (4) the claim is an improper "shotgun" pleading, and (5) punitive damages and attorney fees are not available. Plaintiff opposes the motion. Doc. 60.

## II.
## LEGAL STANDARD

Rule 12(b)(6) allows for dismissal when a plaintiff "fail[s] to state a claim upon which relief can be granted." When reviewing such a motion, the court should focus on the complaint and its attachments. *Wilson v. Birnberg*, 667 F.3d 591, 595 (5th Cir. 2012). The

Court can also consider documents referenced in and central to a party's claims only if plaintiffs do not object. *Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003). Courts "may also consider matters of which [it] may take judicial notice." *Hall v. Hodgkins*, 305 Fed. App'x 224, 227 (5th Cir. 2008) (internal citation omitted) (quoting *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir.1996) (unpublished opinion)).

Such motions are reviewed with the court "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010). However, "the plaintiff must plead enough facts 'to state a claim to relief that is plausible on its face.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Accordingly, the court's task is not to evaluate the plaintiff's likelihood of success but instead to determine whether the claim is both legally cognizable and plausible. *Lone Star Fund v. (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

## III.
## LAW & ANALYSIS

### A. Preemption of Failure to Warn Claim

Federal preemption of state law come from the United States Constitution's Supremacy Clause, which declares federal law to "be the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. The Supreme Court has identified two "cornerstones" of preemption jurisprudence: (1) "the purpose of Congress is the ultimate touchstone in every pre-emption case" and (2) the court begins "with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest

purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). The doctrine applies, in relevant part, not just to express conflicts but also "when it is impossible for a private party to comply with both state and federal requirements." *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. __, 139 S.Ct. 1668, 1672 (2019) (internal quotations omitted).

"[W]hen a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for preemption purposes." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623–24 (2011). State failure-to-warn claims are thus preempted if FDA approval is needed to add the warning that plaintiff alleges is required by state law. *Id.* at 623–24; *see Wyeth*, 555 U.S. at 568. This is a "demanding defense" rather than a pleading requirement. *Gremo v. Bayer Corp.*, 469 F.Supp.3d 240, 252 (D.N.J. 2020) (quoting *Albrecht*, 139 S.Ct. at 1676).

The FDA regulates the safety information on labels for prescription drugs marketed in the United States.[1] 21 U.S.C. § 355(b)(1)(F); 21 C.F.R. 201.57(a). The FDA's premarket approval of a drug includes approval of the text of the proposed label. *Wyeth*, 555 U.S. at 568. Generally speaking, a manufacturer can only change a drug label if the FDA approves a supplemental application. *Id.* A manufacturer may also unilaterally alter the label under the "changes being effected" ("CBE") regulation, if the changes "add or strengthen a contraindication, warning, precaution, or adverse reaction" in order to "reflect newly acquired information." 21 C.F.R. § 314.70(c)(6)(iii). "Newly acquired information" is that

---

[1] A drug's label includes not just the sticker affixed to a prescription bottle but also the written material sent to the prescriber as well as the material, such as package inserts, given to the patient when the drug is handed to her at the pharmacy. *Albrecht*, 139 S.Ct. at 1672; *see* 21 U.S.C. § 321(m).

which "reveal[s] risks of a different type or greater severity or frequency than previously included in submissions" to the FDA. 21 C.F.R. § 314.3(b). It includes both new data and new analyses of submitted data. *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 707 (2d Cir. 2019). If the CBE regulation applies, "a drug manufacturer will not ordinarily be able to show that there is an actual conflict between state and federal law such that it was impossible to comply with both."[2] *Albrecht*, 139 S.Ct. at 1679.

Lilly maintains that plaintiff's failure to warn claim is preempted because she cannot show the existence of "newly acquired information" justifying a unilateral label change. According to the complaint, Lilly submitted NDA 215866 for Mounjaro (tirzepatide) "as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus" on September 14, 2021, and the FDA approved same on May 13, 2022. Doc. 5, ¶¶ 37–38. The accompanying safety summary and prescribing information did not identify gastroparesis as a risk. *Id.* at ¶ 38. Plaintiff maintains, however, that the risk of delayed gastric emptying from GLP-1 receptor antagonists is "well-documented" and that defendants knew or should have known of this risk. *Id.* at ¶ 60. In support plaintiff cites articles from 2010 and 2017 indicating that GLP-1 receptor antagonists slow gastric emptying. *Id.* at ¶¶ 60–61. She also cites seven reports of delayed gastric emptying in the clinical trials of Wegovy, another drug of the same class, and asserts without citation that "a phase 1 study of Mounjaro . . . found that tirzepatide delays gastric emptying." *Id.* at ¶¶

---

[2] At the same time, the FDA retains authority to reject labeling changes made through the CBE process. *Wyeth*, 555 U.S. at 571. A manufacturer can thus establish impossibility preemption even in the face of "newly acquired information" if it shows through "clear evidence that the FDA would not have approved a change" to the label. *Id.* Lilly cites this proposition, but focuses its argument on the extent to which any of plaintiff's allegations show the existence of "newly acquired information."

63–65. Finally, she cites the following medical literature predating Lilly's NDA and the FDA's approval:

- An August 2020 article, "Diabetic Gastroparesis: A Review," which states "[o]ther patients do not know they have diabetic gastroparesis until they are put on a glucagon-like peptide 1 (GLP-1) receptor agonist such as . . . semaglutide[.] This class of drugs can exacerbate the symptoms of diabetic gastroparesis."

- A September 2020 article funded and reviewed by the Novo Nordisk defendants, reporting on two global clinical trials evaluating the effects of semaglutide in patients with cardiovascular effects and diabetes. The review noted discontinuation of both oral and injectable semaglutide at higher rates than placebo due to adverse events including nausea, vomiting, and diarrhea. The authors advised that, "[f]or patients reporting severe adverse gastrointestinal reactions, it is advised to monitor renal functions when initiating or escalating doses of oral semaglutide" and that "patients should be made aware of the occurrence of gastrointestinal AEs with GLP-1 RAs."

- A July 2021 article funded and reviewed by the Novo Nordisk defendants, considering 23 randomized controlled trials across the globe and concluding that "gastrointestinal disturbances" were "well-known" side effects of semaglutide use.

- An October 2021 article from the Journal of Integrative Medicine on medication-induced gastroparesis, which included two case reports of diabetics who developed gastroparesis while taking semaglutides and whose symptoms resolved after discontinuing the drug.

Doc. 5, ¶¶ 68–73.

As for post-approval items, plaintiff cites the following:

- a June 2023 warning from the American Society of Anesthesiologists that patients should stop taking GLP-1 RA's one week prior to elective surgery, because the medications delay gastric emptying and the associated vomiting could increase the risk of regurgitation and aspiration during surgery

- a July 2023 Rolling Stone article, "Ozempic Users Report Stomach Paralysis from Weight Loss Drug: 'So Much Hell,'" highlighting three patients who suffered severe gastrointestinal side effects (including gastroparesis) while using GLP-1 RAs.

- a July 2023 CNN report that patients taking Ozempic have been diagnosed "with severe gastroparesis, or stomach paralysis, which their doctors think may have resulted from or been exacerbated by" the medication. The report also stated that the FDA "said it has received reports of people on the drugs experiencing stomach paralysis[.]"

*Id.* at ¶¶ 74–77. Plaintiff also asserts that "it is reasonable to infer that Lilly received AEs about gastroparesis before news reporters did" and was aware of increasing incidents of gastroparesis before the CNN or Rolling Stone reports. Doc. 60, p. 20.

Lilly points to FDA clinical review documents, showing that "many of the specific journal articles and case reports" cited in the complaint were considered by the agency in the approval process. It thus maintains that the post-approval reports do not qualify as "newly acquired information" because they do not "reveal risks of a different type or

greater severity or frequency than previously" submitted to the agency. As the Supreme Court explained, however, the expansive definition of "newly acquired information" is meant to "account[] for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments." *Wyeth*, 555 U.S. at 569. Accordingly, "there is no bright-line, one-size-fits-all line marking the moment when an analysis reveals new information." *Knight v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 984 F.3d 329, 341 (4th Cir. 2021). Instead, "a careful review of the record is needed to determine whether a conclusion has been reached." *Id.*

From the face of the complaint, it appears that an association between potentially severe gastrointestinal side effects and GLP-1 RAs was known to the FDA when it approved both drugs. Delayed gastric emptying was also mentioned as one of the drug class's mechanisms, though not as a complication. Gastroparesis is mostly mentioned as a complication of diabetes for which patients should be monitored while taking semaglutides. The additional reports from summer 2023, on the other hand, point to growing awareness of the condition as an adverse effect of semaglutide use. At this early stage of the litigation, the court cannot evaluate whether the post-approval reports reflect an increasing incidence of gastroparesis that might qualify as "newly acquired information."

### B. Learned Intermediary Doctrine

Lilly next asserts that plaintiff's failure to warn claim is barred by the learned intermediary doctrine. This doctrine holds that a drug manufacturer discharges its duty to consumers by reasonably informing prescribing physicians of the risks associated with a

drug. *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 265 (5th Cir. 2002) (citing *Anderson v. McNeilab, Inc.*, 831 F.2d 92, 93 (5th Cir. 1987)). Accordingly, plaintiff must allege facts showing (1) "that the defendant failed to warn (or inadequately warned) the physician of a risk associated with the product that was not otherwise known to the physician" and (2) "that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury." *Id.* at 265–66. The learned intermediary doctrine is an affirmative defense on which defendant bears the burden of proof. *Brocato v. DePuy Orthopaedics, Inc.*, 2015 WL 854150, at *6 (E.D. La. Feb. 25, 2015) (citing *Ebel v. Eli Lilly and Co.*, 536 F.Supp.2d 767, 772 (S.D. Tex. 2008)).

Plaintiff has alleged, *inter alia*, (1) that she was prescribed Ozempic and Mounjaro by physician(s); (2) that the labels were inadequate to apprise her prescribing physicians of "all possible adverse side effects . . . including the increased risk of gastroparesis," of the severity and duration of such side effects, and the fact that the drugs "had not been sufficiently and/or adequately tested for safety risks, including gastroparesis;" and (3) that plaintiff's physicians would not have prescribed these drugs if they had been warned of the risk or would have given her additional information in order to make an informed decision regarding her use of these drugs, which would have caused her not to use the drugs and thereby avoid the side effects she has suffered. Doc. 5, ¶¶ 113–21. Lilly maintains that the claim must fail, because the labels contained warnings of related gastrointestinal symptoms and because the risk of gastrointestinal side effects from GLP-1 RAs was well-documented in the medical literature and mainstream media. Plaintiff's assertion, however, relates to the failure to warn more specifically of the gastroparesis risk. The extent to which her

physicians were adequately apprised of the risks will require evidence beyond the scope of this motion. The learned intermediary doctrine thus provides no basis for dismissal under Rule 12(b)(6).

### C. Express Warranty Claim

Lilly next argues that plaintiff's express warranty claim is insufficiently pled because she fails to identify the content of any express warranty. As to express warranties, the LPLA provides:

> A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was not true.

La. R.S. § 9:2800.58. To maintain a claim under this portion of the LPLA, a plaintiff must show: "(1) the manufacturer made an express warranty regarding the product, (2) the plaintiff was induced to use the product because of that warranty, (3) the product failed to conform to that express warranty, and (4) the plaintiff's damage was proximately caused because the express warranty was untrue." *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 452 (5th Cir. 2002). An express warranty is "a representation or statement about a product that affirms the product possesses specified characteristics or qualities." *Guidry v. Janssen Pharm., Inc.*, 206 F.Supp.3d 1187, 1199 (E.D. La. 2016) (citing La. R.S. § 9:2800.53(6)). For pharmaceuticals, marketing materials may rise to the level of an express warranty if they make claims as to the product's safety. *Boutte v. Stryker Biotech, LLC*, 67 F.Supp.3d 732, 738–39 (W.D. La. 2014). A plaintiff is not required to "point to specific language offered by a manufacturer," but must still "specify the warranty in question" to state a claim

for relief. *Fuller v. Eisai Inc.*, 513 F.Supp.3d 710, 722 (E.D. La. 2021) (internal quotations omitted).

The first amended complaint contains sixteen paragraphs of allegations relating to defendants' marketing of Ozempic and Mounjaro. Doc. 5, ¶¶ 39–55. As to Lilly, the allegations include its announcement of the FDA's fast-track approval of tirzepatide, its promotion of Mounjaro's safety "in a broad range of adults with type 2 diabetes,"[3] the extensive media campaign launched in early 2023, and a New York Times article from April 2023 noting that Mounjaro was "gaining attention, with many people using it off-label to lose weight." *Id.* at ¶¶ 50–55. Under her breach of warranty claim, plaintiff alleges that the labels, advertisements, and other communications made by defendants to plaintiff and her prescribing physicians warranted that Ozempic and Mounjaro "were safe as an adjunct to diet and exercise to improve glycemic control in adults with type 2 diabetes mellitus." *Id.* at ¶¶ 134–35. She further alleges that, had she and/or her prescribing physician been adequately warned of the products' risks, she would not have taken or been prescribed the drugs and thus would not have suffered gastroparesis or its sequelae. *Id.* at

---

[3] Specifically, plaintiff alleges that Lilly announced the FDA's approval of Mounjaro by "proclaiming 'Mounjaro's safety . . . in a broad range of adults with type 2 diabetes.'" Doc. 5, ¶ 50. The linked article states:

> "Mounjaro delivered superior and consistent A1C reductions against all of the comparators throughout the SURPASS program, which was designed to assess Mounjaro's efficacy and safety in a broad range of adults with type 2 diabetes who could be treated in clinical practice. The approval of Mounjaro is an exciting step forward for people living with type 2 diabetes given the results seen in these clinical trials," said Juan Pablo Frías, M.D., Medical Director, National Research Institute and Investigator in the SURPASS program.

*FDA approves Lilly's Mounjaro (tirzepatide) injection, the first and only GIP and GLP-1 receptor agonist for the treatment of adults with type 2 diabetes*, Cision PR Newswire (May 13, 2022), available at https://www.prnewswire.com/news-releases/fda-approves-lillys-mounjaro-tirzepatide-injection-the-first-and-only-gip-and-glp-1-receptor-agonist-for-the-treatment-of-adults-with-type-2-diabetes-301547339.html (last visited December 7, 2023). Plaintiff does not allege that this statement amounts to a misrepresentation of the referenced clinical trial results, and the court cannot find any claims on safety within the announcement other than the fact of the drug's FDA approval.

¶¶ 136–53. She fails to identify any representations amounting to specific promises about the product's safety, however. This omission is fatal to her claim.

As several district courts have affirmed, general allegations that the manufacturer has warranted the product as "safe" are too vague to support a claim under the LPLA. *See Fuller*, 513 F.Supp.3d at 723 (conclusory allegations of representations that drug was "safe" and "effective to use" did not rise to the level of a warranty under the LPLA); *see also Corley v. Stryker Corp.*, 2014 WL 3375596, at *5 (W.D. La. May 27, 2014), report and recommendation adopted *sub nom. Corley v. Stryker Orthopaedics*, 2014 WL 3125990 (W.D. La. Jul 3, 2014) (paraphrased guarantee that product "was effective and safe for its intended use" did not qualify as an express warranty); *Lewis v. Baxter Int'l Inc.*, 2017 WL 661324, at *5 (E.D. La. Feb. 17, 2017) (dismissing express warranty claim premised on alleged guarantee that product was "suitable and safe for use"); *accord Aston v. Johnson & Johnson*, 248 F.Supp.3d 43, 55 (D.D.C. 2017); *Fraser v. Wyeth, Inc.*, 857 F.Supp.2d 244, 257–58 (D. Conn. 2012); *In re Meridia Prods. Liab. Litig.*, 328 F.Supp.2d 791, 818 (N.D. Ohio 2004). Context is important, because the disclaimers and disclosures frequently attached to affirmations of safety for prescription drugs may eliminate an express warranty claim. *E.g.*, *In re Avandia Marketing Sales Practices & Prods. Liab. Litig.*, 588 F. App'x 171, 175–76 (3rd Cir. 2014). Here, plaintiff's allegations amount to a general statement that the product was advertised in some capacity as safe for its intended use. This does not provide enough factual information for the court to determine whether an express warranty was made, sufficient to induce plaintiff's reliance, and cannot support a claim for breach. Accordingly, the motion will be granted on this basis. This ruling is without prejudice to

plaintiff's right to amend within 30 days if she can allege a sufficient basis for an express warranty.

### D. Shotgun Pleading

Lilly next argues that the complaint is an improper "shotgun pleading," lumping together allegations and legal conclusions about two different products made by two different companies. On review of the complaint, however, the court finds that plaintiff's factual allegations adequately distinguish between Novo Nordisk/Ozempic and Lilly/Mounjaro. The motion will likewise be denied on this basis.

### E. Punitive Damages and Attorney Fees

Finally, Lilly maintains that the claims for punitive damages and attorney fees should be dismissed because these are not recoverable under the LPLA. Under Louisiana law, punitive damages are only allowed where expressly authorized by statute. *Bladen v. C.B. Fleet Holding Co.*, 487 F.Supp.2d 759, 770 (W.D. La. 2007) (citing *Int'l Harvester Credit Corp. v. I.T. Seale*, 518 So.2d 1039, 1041 (La. 1988)). The LPLA makes no such provision. *Id.* Likewise, under "the bedrock principle known as the American Rule," each litigant is responsible for his own fees "unless a statute or contract provides otherwise." *Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015) (internal quotations omitted). The LPLA also makes no provision as to recovery of attorney fees. *Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 900 (5th Cir. 2010). Accordingly, proceeding under Louisiana law, plaintiff has no claim for punitive damages or attorney fees.

Plaintiff concedes as much but argues that the court should reserve judgment in case it finds that another state's law applies to the issue of punitive damages. Louisiana's choice

of law statutes permit the application of different states' laws to different issues in a case, a practice known as dépeçage. *PHI, Inc. v. Apical Indus., Inc.*, 2021 WL 67726, at *7 & n. 45 (W.D. La. Jan. 7, 2021) (citing La. C.C. art. 3515, cmt. (d)). Plaintiff argues that, because any decision on choice of law requires a review of "the totality of the circumstances" of the case, this aspect of the motion is premature. *Duhon v. Union Pac.*, 43 F.3d 1011, 1018 (5th Cir. 1995). Lilly fails to show the impossibility of recovering attorney fees or punitive damages under any other applicable state law. Accordingly, the court agrees that any such determination must await a motion for summary judgment to determine choice of law.

## IV.
## CONCLUSION

For the reasons stated above, Lilly's Motion to Dismiss [doc. 49] will be **GRANTED** as to the express warranty claim and **DENIED** in all other respects.

**THUS DONE AND SIGNED** in Chambers on the 11th day of December, 2023.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**